IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 3, 2020

## IN RE BRIAN W. ET AL.

**Appeal from the Juvenile Court for Davidson County**
**No. 249269      Sheila Calloway, Judge**

_____

### No. M2020-00172-COA-R3-PT

_____

A mother and father appeal the juvenile court's decision to terminate their parental rights based on six statutory grounds. They also challenge the juvenile court's finding by clear and convincing evidence that termination of their parental rights was in the best interest of the children. We affirm the juvenile court's termination of the mother's and father's parental rights.

### Tenn. R. App. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed

ANDY D. BENNETT, J., delivered the opinion of the Court, in which CARMA DENNIS MCGEE, and KRISTI M. DAVIS, JJ., joined.

Clayton Michael Cardwell, Nashville, Tennessee, for the appellant, Kimberly U.

Kelli Barr Summers, Brentwood, Tennessee, for the appellant, Brian W.

Herbert H. Slatery, III, Attorney General and Reporter, and Lexie Ashton Ward, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

### OPINION

#### FACTUAL AND PROCEDURAL BACKGROUND

Brian and Edmund were born in 2012 and 2014, respectively, to Kimberly U. ("Mother") and Brian W. ("Father"). On January 30, 2018, the Tennessee Department of Children's Services ("DCS" or "the Department") received a referral alleging environmental neglect, medical maltreatment, drug exposure, and lack of supervision. That same day, the juvenile court entered an emergency protective custody order placing the children in DCS's custody. At the time of removal, the family was homeless and staying in a hospital where the paternal grandfather was a patient.

On February 1, 2018, DCS filed a petition for dependency and neglect and for emergency temporary custody of the children. The juvenile court heard the petition for dependency and neglect on May 8, 2018; neither parent attended the hearing, but their attorneys did attend. In an order entered on May 23, 2018, the juvenile court made several findings of fact regarding the condition of the children when they were removed from the parents' custody. The court found that "their hair was matted to their heads" and "they appeared to be filthy and unbathed." The court further found that the children had not eaten in twenty-four hours, both wore diapers despite being six and three years old, they had significant vision and dental problems, and Brian had not been enrolled in school. Finally, the court found that physicians who examined the children diagnosed Edmund with clinical rickets and diagnosed both children with "pervasive global developmental delays"[1] that could only have been caused by neglect. Based on these findings, the court adjudicated the children dependent and neglected and found that they were severely abused pursuant to Tenn. Code Ann. § 37-1-102(b)(22) (2018).

The parents appealed the May 23, 2018 order, and a rehearing was scheduled for October 8, 2018. On the date of the rehearing, the juvenile court waited for two hours, but neither parent appeared despite receiving proper notice of the hearing. Consequently, the court dismissed the request for rehearing due to a failure to prosecute and held that the May 23, 2018 order "shall remain the order of the Court." No further appeal was taken from the adjudicatory order.

On February 26, 2018, DCS developed an initial permanency plan. The juvenile court ratified that plan on March 9, 2018, and explained to both Mother and Father the law pertaining to abandonment and the consequences of willfully failing to visit the children. The juvenile court suspended the parents' visitation on December 21, 2018, due to their lack of compliance with the plan's requirements and concerns about the children's welfare. Thereafter, DCS developed a second permanency plan on January 25, 2019. At a hearing on February 1, 2019, the juvenile court ratified this plan and informed Mother and Father that visitation could be reinstated if they began to comply with the plans' requirements. The requirements of both permanency plans will be discussed in detail later in this opinion.

The Department filed a petition to terminate the parental rights of Mother and Father on May 16, 2019. After a three-day trial, the juvenile court entered an order terminating Mother's and Father's parental rights. The court determined that the following grounds for termination had been proven by clear and convincing evidence as to both parents: (1) abandonment by failure to visit, (2) abandonment by failure to provide a suitable home, (3) persistence of conditions, (4) substantial noncompliance with the requirements of the

---

[1] "Global developmental delays" is a term used to describe "a child show[ing] delays in several areas of development, and this has continued for at least six months." https://cerebralpalsy.org.au/about-conditions/global-development-delay/#1534292710122-6f2fa95c-5b72. Delays may occur in speech, learning, social skills, fine motor movement, and gross motor movement. *Id.*

permanency plans, (5) severe child abuse, and (6) failure to demonstrate an ability and willingness to assume custody or financial responsibility. The court further determined that there was clear and convincing evidence that termination of Mother's and Father's parental rights was in the best interest of the children.

Both parents appealed and present the following issues: whether the juvenile court erred in finding by clear and convincing evidence that grounds existed to terminate their parental rights and whether the juvenile court erred in determining that termination of their parental rights was in the best interest of the children.

STANDARD OF REVIEW

Under both the federal and state constitutions, a parent has a fundamental right to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 249-50 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)). Although this right is fundamental, it is not absolute and may be terminated in certain situations. *In re Angela E.*, 303 S.W.3d at 250. Our legislature has identified "'those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B., IV*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)).

Tennessee Code Annotated section 36-1-113 provides the grounds and procedures for terminating parental rights. First, a petitioner seeking to terminate parental rights must prove that at least one ground for termination exists. Tenn. Code Ann. § 36-1-113(c)(1); *In re Angela E.*, 303 S.W.3d at 251. Second, a petitioner must prove that terminating parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

The termination of a parent's rights is one of the most serious decisions courts make because "[t]erminating parental rights has the legal effect of reducing the parent to the role of a complete stranger," *In re W.B., IV*, 2005 WL 1021618, at *6, "and of 'severing forever all legal rights and obligations of the parent or guardian.'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(l)(1)). Consequently, a parent has a constitutional right to fundamentally fair procedures during termination proceedings. *In re Hannah C.*, No. M2016-02052-COA-R3-PT, 2018 WL 558522, at *2 (Tenn. Ct. App. Jan. 24, 2018) (citing *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016)).

Tennessee law ensures fundamental fairness in termination proceedings by requiring a heightened standard of proof—clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re Carrington H.*, 483 S.W.3d at 522. Before a parent's rights

may be terminated, a petitioner must prove both the grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d at 546. "Clear and convincing evidence 'establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Serenity B.*, No. M2013-02685-COA-R3-PT, 2014 WL 2168553, at *2 (Tenn. Ct. App. May 21, 2014) (quoting *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004)).

We review the trial court's findings of fact de novo with a presumption of correctness unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *In re Serenity B.*, 2014 WL 2168553, at *2. In light of the heightened standard of proof, we must then make our own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524.

ANALYSIS

I.  Grounds for termination.

A.  Abandonment by failure to visit.

A parent's rights may be terminated for abandoning his or her child. Tenn. Code Ann. § 36-1-113(g)(1). Tennessee Code Annotated section 36-1-102(1)(A) provides five alternative definitions of "abandonment," but only the definitions provided in subsections (i) and (ii) are relevant in this case. We will begin with the definition of "abandonment" found in Tenn. Code Ann. § 36-1-102(1)(A)(i), which provides, in pertinent part, as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians . . . have failed to visit . . . .

A failure to visit occurs when a parent, "for a period of four (4) consecutive months, [fails] to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). "Token visitation" is "visitation, under the circumstances of the individual case, [that] constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C).

Prior to July 2018, a petitioner seeking to terminate a parent's rights based on abandonment bore the burden of proving that the parent's failure to visit was "willful." *See* Tenn. Code Ann. § 36-1-102(1)(A)(i) (2016). The Tennessee General Assembly amended Tenn. Code Ann. § 36-1-102(1)(A)(i) on July 1, 2018, removing the willfulness requirement from the definition of abandonment by failure to visit. *See* 2018 TENN. PUB. ACTS ch. 875. The statute now provides that willfulness is an affirmative defense. Tenn. Code Ann. § 36-1-102(1)(I). Thus, the parent now bears the burden of proving by a preponderance of the evidence that the failure to visit was not willful. *Id.*

In the context of the parental termination statutes, "willfulness" does not require "malevolence or ill will." *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005). It merely requires that the conduct at issue consist "of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." *Id.* We have previously explained "willfulness" as follows:

> Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.
>
> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit . . ., has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit . . . is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to . . . develop a relationship with the child.

*Id.* at 863-64 (citations omitted); *see also In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) ("A parent cannot be said to have abandoned a child when his failure to visit or support is due to circumstances outside his control.").

In the present case, DCS filed the petition to terminate Mother's and Father's parental rights on May 16, 2019. Thus, the relevant four-month period for determining whether both parents abandoned the children under Tenn. Code Ann. § 36-1-102(1)(A)(i) is January 16, 2019 to May 15, 2019. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (holding that the applicable four-month time period for determining whether a parent has willfully failed to support is "the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed"). Following the removal, an initial visit occurred in March 2018 at DCS's office. Both parents attended this visit, but Father was escorted off the premises shortly after the visit began. Reba Terry, a DCS caseworker assigned to the case, testified that Father's visit was cut short because he was not allowed to be in DCS's office due to threatening remarks he made to a child protective services worker when the

children were removed from the parents' custody. Mother did not leave when Father was escorted out, but she visited the children for only fifteen minutes. The Department scheduled additional visits, but Mother and Father failed to attend any other visits. According to Ms. Terry, the children's behavior regressed each time the visits were scheduled and the parents failed to attend. Thus, the juvenile court suspended visitation on December 21, 2018.

Mother and Father contend that their failure to visit the children during the relevant four-month period was not willful because they were not allowed to visit the children after the juvenile court suspended visitation on December 21, 2018.[2] We have previously held that if "a parent's visitation has been suspended by the trial court and the parent has the ability to demonstrate a change in situation or behavior that would warrant reinstating visitation but fails to do so," that parent's failure to visit can be found willful. *In re Kiara C.*, No. E2013-02066-COA-R3-PT, 2014 WL 2993845, at *6 (Tenn. Ct. App. June 30, 2014). At the February 1, 2019 permanency plan hearing, the magistrate explained that visitation could be reinstated if Mother and Father began complying with the requirements of the permanency plan. Mother and Father, therefore, had control over whether visitation was reinstated. All they had to do was start complying the plans' requirements, but they failed to do so. Therefore, Mother and Father failed to prove that their failure to visit the children was not willful. We conclude that the juvenile court properly terminated Mother's and Father's parental rights pursuant to this ground.[3]

B. Abandonment by failure to provide a suitable home.

We now turn to the definition of "abandonment" found in Tenn. Code Ann. § 36-1-102(1)(A)(ii) which provides:

(*a*) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child

---

[2] In its appellate brief, the Department correctly points out that "[t]he record does not reflect that Mother and Father raised this defense in any pleading." A thorough examination of the record, however, shows that DCS did not object when Mother and Father introduced evidence regarding "willfulness" at trial nor did they bring this issue to the juvenile court's attention after the court entered the termination order which clearly considered the parents' willfulness argument. Thus, the issue of "willfulness" was tried by consent. *See Renken v. Renken*, No. M2017-00861-COA-R3-CV, 2019 WL 719179, at *4 (Tenn. Ct. App. Feb. 20, 2019) (stating "[w]hen issues not raised by the pleadings are tried by consent, 'they shall be treated in all respects as if they had been raised in the pleadings'" ) (quoting TENN. R. CIV. P. 15.02).

[3] In his appellate brief, Father also includes an argument section regarding abandonment for failure to support. This Court is not required to review grounds not relied upon by a trial court for terminating a parent's rights. *See In re Carrington H.*, 483 S.W.3d at 525. Because the juvenile court did not terminate either parent's rights for failure to support, we will not consider this argument.

was placed in the custody of the department or a licensed child-placing agency;

(*b*) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for a child, but that the parent or parents or guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

For purposes of this provision, DCS must make "reasonable efforts" to assist parents in obtaining a suitable home by using its "'superior insight and training.'" *In re Jamel H.*, No. E2014-02539-COA-R3-PT, 2015 WL 4197220, at *6 (Tenn. Ct. App. July 13, 2015) (quoting *State Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008)). To be considered reasonable, the Department's efforts need not be "Herculean," *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014), but they must be equal to or greater than those of the parent. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(*c*).

A suitable home requires "'more than a proper physical living location.'" *In re Daniel B.*, No. E2019-01063-COA-R3-PT, 2020 WL 3955703, at *4 (Tenn. Ct. App. July 10, 2020) (quoting *Tenn. Dep't of Children's Servs. v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)). A suitable home also requires that "[a]ppropriate care and attention be given to the child," *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016), and that the home "be free of drugs and domestic violence," *In re Hannah H.*, 2014 WL 2587397, at *9.

The juvenile court removed the children and placed them in DCS custody on January 30, 2018. After an adjudication hearing in May 2018, the juvenile court entered an order finding both that the children were dependent and neglected and that DCS had

made reasonable efforts to prevent their removal. Thus, the Department established the first two requirements of this ground for termination. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)(*a*), (*b*).

Regarding the statute's third requirement, Mother and Father argue that DCS did not make reasonable efforts to assist them in establishing a suitable home during the first four months after the children were removed from their custody. Mother and Father are correct that the evidence in the record shows that, other than developing the original permanency plan, the initial DCS caseworker assigned to the case, Kershee Hurt, provided minimal assistance to the parents during the four months immediately following the removal. We have previously stated, however, that Tenn. Code Ann. § 36-1-102(1)(A)(ii) "'does not limit the window during which DCS may satisfy its obligation to make reasonable efforts to the four-month period directly following statutory removal.'" *In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App. Dec. 15, 2016) (quoting *In re J.D.L.*, No. M2009-00574-COA-R3-PT, 2009 WL 4407786, at *12 n.8 (Tenn. Ct. App. Dec. 2, 2009)). What is required is that DCS make "'reasonable efforts' for *a four-month period* following the removal of the children." *In re Rahjada W.*, No. E2019-01798-COA-R3-PT, 2020 WL 2893434, at *5 (Tenn. Ct. App. June 3, 2020) (emphasis added).

In August 2018, Ms. Terry replaced Ms. Hurt as the family's caseworker. From August 2018 through October 2019, DCS developed a permanency plan, attempted to remain in contact with Mother and Father despite their lack of cooperation, and referred Mother and Father to and paid for necessary services including psychological evaluations, parenting evaluations, mental health assessments, drug screens, domestic violence courses, an alcohol and drug assessment and the recommended intensive outpatient treatment. By contrast, during the nearly two years following the children's removal, Mother and Father took little to no action toward locating a place to live or making the lifestyle changes that were necessary for them to safely parent. We conclude that the efforts by DCS exceeded any efforts by Mother and Father.

Further, after the removal, Mother and Father stayed with a friend or at hotels or motels. At trial, Mother and Father testified that they had been living in a week-to-week motel since June 2019, but Ms. Terry was never able to confirm that they lived in that location despite DCS's attempts to contact them there. For almost two years following the children's removal, Mother and Father failed to participate in any of the counseling or assessment requirements in the permanency plans. *See In re M.F.O.*, No. M2008-01322-COA-R3-PT, 2009 WL 1456319, at *5 (Tenn. Ct. App. May 21, 2009) (stating that counseling and assessment requirements may be "directly related to the establishment and maintenance of a suitable home" because the problems and conditions towards which they are focused "address matters which make the home environment suitable for raising children and which keep them from becoming dependent and neglected"). The only effort Mother and Father made was to participate in an alcohol and drug assessment one month

before trial.  In sum, the record demonstrates that Mother and Father lacked a concern for the children to such a degree that there appears to be little likelihood that they would be able to establish a suitable home in the near future.  The trial court did not err in terminating Mother's and Father's parental rights under this ground for termination.

### C.  Substantial noncompliance.

The trial court also terminated Mother's and Father's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(2), which provides that a parent's rights may be terminated where "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4."  To succeed under this ground, DCS must "demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place."  *In re M.J.B.*, 140 S.W.3d at 656.  Conditions that make foster care placement necessary may "include conditions related both to the child's removal and to family reunification."  *In re Valentine*, 79 S.W.3d at 547.  The court must then determine whether the noncompliance is substantial.  *In re M.J.B.*, 140 S.W.3d at 656.  In assessing a parent's substantial noncompliance with a permanency plan, the court should measure "both the degree of noncompliance and the weight assigned to that requirement."  *In re Valentine*, 79 S.W.3d at 548.  "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance."  *In re M.J.B.*, 140 S.W.3d at 656.

The initial permanency plan, dated February 26, 2018, required that Mother and Father complete the following requirements:  (1) obtain suitable housing, (2) obtain a legal source of income, (3) maintain contact with the Department and notify DCS within ten (10) days of any change to contact information, (4) participate in a functional parenting assessment, (5) demonstrate the ability to parent the children and meet their basic needs, and (6) submit to random drug screens.  Mother was additionally required to submit to a physical and follow all recommendations and submit to an alcohol and drug assessment and follow all recommendations.  Father was additionally required to refrain from incurring new legal charges and to sign a release of information for the Department to access all treatment records.  The second permanency plan, dated January 25, 2019, added the requirement that Mother and Father maintain a bonded relationship with the children.

The juvenile court ratified both plans and found that the requirements of both plans were reasonable and related to remedying the conditions that necessitated foster care for the children.  The children entered foster care primarily due to serious medical needs that were not being met by the parents, homelessness, and the parents' substance abuse issues.  We agree with the juvenile court that the requirements of the plans were reasonable and necessary to remedying these concerns.

For a year and a half following the children's removal, Mother and Father made little to no effort to address the requirements in the first plan, which resulted in the suspension of visitation. Despite knowing visitation would be reinstated if they began making progress with the plans' requirements, Mother and Father continued to make little to no effort until one month before trial. On September 25, 2019, Mother and Father participated in an alcohol and drug assessment. They failed, however, to complete the recommended intensive outpatient treatment or to submit the results from their tuberculosis tests that the rehabilitation facility requested Mother and Father complete before starting the intensive outpatient treatment.

Beyond failing to complete any other assessments, Mother and Father did not submit to random drug screens and continued to incur legal charges for failing to appear in court for traffic violations. Furthermore, Mother and Father failed to maintain contact with DCS. Ms. Terry testified that the Department only had Father's contact information, but he regularly did not answer calls from her or respond to the emails she sent to him. Mother never provided the Department with her contact information, preferring that Father "handl[e] all of it, because there was a lot of it that [she] didn't understand." Mother and Father testified that they had been living in stable housing at a week-to-week motel since June 2019 and that they had been working as independent contractors who build and disassemble stages for events. Despite her attempts, however, Ms. Terry was never able to verify that Mother and Father had obtained either stable housing or employment.

Throughout the trial, Mother and Father refused to accept any responsibility for their failure to comply with nearly all of the permanency plans' requirements. Instead, they blamed the Department. Mother and Father now attempt to do the same thing in this Court. They assert that, despite the evidence that they failed to comply with the requirements of the plans, the juvenile court erred in terminating their parental rights pursuant to this ground because DCS did not make reasonable efforts to assist them with the requirements. This ground for termination, however, does not require that the Department to "expend reasonable efforts to assist a parent in complying with the permanency plan requirements." *In re Skylar P.*, No. E2016-02023-COA-R3-PT, 2017 WL 2684608, at *7 (Tenn. Ct. App. June 21, 2017); *see also In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015) ("[I]n a termination proceeding, the extent of [the Department's] efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent."). In light of the foregoing, we conclude that the trial court properly terminated Mother's and Father's parental rights pursuant to this ground.

D. Persistence of conditions.

The juvenile court also terminated Mother's and Father's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3). This ground is often referred to as "persistence of conditions" and allows courts to terminate parental rights in situations where:

The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;

> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

> (iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3)(A).

The persistence of conditions ground "focuse[s] on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *In re Audrey S.*, 182 S.W.3d at 874. The purpose behind this ground for termination is "'to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child.'" *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds*, *In re Kaliyah S.*, 455 S.W.3d at 555, (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)). Therefore, the question we must answer is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

Here, there is no dispute that the children were removed from Mother's and Father's custody by a protective custody order and later adjudicated dependent and neglected more than six months before the termination hearing began. *See* Tenn. Code Ann. § 36-1-113(g)(3)(B). The children were removed due to environmental neglect, medical maltreatment, drug exposure, and lack of supervision. At the time of removal, the family was homeless and the children suffered from significant health issues, anxiety, and global developmental delays. The children's lack of regular medical care was to such a degree that the juvenile court found that they were severely abused. Mother and Father did virtually nothing for two years following removal to demonstrate that the children could

- 11 -

ever be safely returned to their custody. Regarding this ground for termination, the juvenile court found as follows:

> [Mother] and [Father] had not yet, at the time of the hearing in this matter, completed the required tasks on the permanency plans that would have made it safe for the children to return home. . . . To ensure the children were safe in their parents' care, they were asked to complete an alcohol and drug assessment and follow the recommendations, submit to random drug screens, complete a mental health assessment with a functional parenting assessment and follow the recommendations, provide a legal source of income to meet the children's needs and provide a safe, stable residence. The parents completed an alcohol and drug assessment with Bradford but failed to follow through with the recommendations for treatment. The parents did not complete any of the remaining tasks, despite having had over 20 months to complete them. As late as one of the hearing dates in this matter, the parents['] housing situation remained unstable and [they] had not addressed the substance abuse concerns.

The record supports these findings. Additionally, Mother and Father refused to accept responsibility for or even acknowledge the severe child abuse pervading this case due to their failure to ensure that the children received necessary medical treatment. When asked about the children's significant health issues, both Mother and Father denied that any of the health issues existed while the children were in their custody and insisted that all of the children's health issues were the result of being in foster care. We have determined that a parent's refusal to acknowledge or take responsibility for severe child abuse "indicate[s] that the conditions that led to the Children's removal still persist and that there is little likelihood such conditions will be remedied in the near future." *In re Shyanne H.*, No. M2019-02127-COA-R3-PT, 2020 WL 3481695, at *6 (Tenn. Ct. App. June 25, 2020); *see also In re L.M.H.*, No. E2017-00604-COA-R3-PT, 2017 WL 4331037, at *6 (Tenn. Ct. App. Sept. 28, 2017); *In re Dakota C.R.*, 404 S.W.3d 484, 501 (Tenn. Ct. App. 2012).

The continuation of the parent and child relationship in this case would also greatly diminish the children's chances of integrating into a permanent home. The children have bonded with their latest foster family. The foster father testified that the children have been receiving the proper medical attention to address their underlying conditions and have made significant progress. Furthermore, the foster parents are interested in adopting the children if they become available for adoption. We conclude that the juvenile court did not err in terminating Mother's and Father's parental rights under this ground for termination.

E.  Severe Child Abuse.

The juvenile court also terminated Mother's and Father's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(4), which states:

> The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

"Severe child abuse" is defined, in relevant part, as:

> Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce . . . severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct[.]

Tenn. Code Ann. § 37-1-102(b)(22)(B) (2018).[4]

On May 23, 2018, the juvenile court magistrate entered an order adjudicating the children dependent and neglected and finding that they were victims of severe child abuse perpetrated by Mother and Father.  Mother and Father appealed requesting that the matter be reheard by the juvenile court judge, but they failed to appear at the rehearing.  The court dismissed Mother's and Father's requests for rehearing for failure to prosecute and ordered that the May 23, 2018 order "remain in full force and effect."  When neither parent further appealed the order, it became a final, nonappealable order.  As this Court has explained:

> The doctrine of *res judicata* applies when "an existing final judgment rendered upon the merits, without fraud or collusion, by a court of competent jurisdiction, is conclusive of rights, questions and facts in issue as to the parties and their privies, in all other actions in the same or any other judicial tribunal of concurrent jurisdiction." *Galbreath v. Harris,* 811 S.W.2d 88, 90 (Tenn. Ct. App. 1990). This court previously applied the doctrine of *res judicata* to prevent a parent from re-litigating whether she committed severe child abuse in a later termination of parental rights proceeding, when such a finding had been made in a previous dependency and neglect action. *See State v. Tate,* No. 01-A-01-9409-CV-00444, 1995 WL 138858, at *5 (Tenn. Ct. App. Mar. 31, 1995).

---

[4] We apply the statute in effect when the juvenile court found that the children were victims of severe child abuse.  Effective July 1, 2018, the General Assembly amended the statute to move the definition of "severe child abuse" to Tenn. Code Ann. § 37-1-102(b)(27)(B).  The definition remained the same, however.

*In re Heaven L.F.*, 311 S.W.3d 435, 439 (Tenn. Ct. App. 2010); *see also In re Raylan W.*, No. M2020-00102-COA-R3-PT, 2020 WL 4919797, at *12-13 (Tenn. Ct. App. Aug. 20, 2020). Mother, Father, and DCS were parties to the dependency and neglect case, and the issue of whether Mother and Father committed severe child abuse was fully litigated in those proceedings. Thus, the issue of whether Mother and Father committed severe child abuse is res judicata, and the juvenile court did not err in finding that DCS had proven this ground for termination by clear and convincing evidence.

### F. Failure to Manifest an Ability and Willingness to Personally Assume Custody.

Finally, the juvenile court found that DCS had proven by clear and convincing evidence that Mother's and Father's parental rights should be terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(14). A court may terminate a parent's rights based on this ground if the parent

> [1] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and [2] placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). This ground requires a party to prove two elements by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1), (g)(14). First, a party must prove that the parent failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14).[5] Second, a party must prove that placing the children in the parent's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14).

Mother and Father failed to manifest an ability to assume custody of the children due to their unresolved issues with unstable housing and substance abuse.[6] They further failed to manifest a willingness to assume custody of the children by making little to no effort to resolve these issues. Neither parent attempted to complete any task on the permanency plans until one month before trial when they completed an alcohol and drug assessment. They failed to follow any of the recommendations from that assessment,

---

[5] There is a split in authority regarding the proof required to establish the first prong, and the Supreme Court has granted permission to appeal in a case that raises the issue. *See In re Neveah M.*, No. M2019-00313-COA-R3-PT, 2020 WL 1042502 (Tenn. Ct. App. Mar. 4, 2020), *perm. app. granted*, No. M2019-00313-SC-R11-PT (Tenn. June 15, 2020). Here, we need not choose one standard over another because the facts in this case satisfy both standards.

[6] Mother does not challenge this ground on appeal but, because Mother's parental rights were terminated pursuant to this ground for termination, we must review the juvenile court's findings as to this ground. *See In re Carrington H.*, 483 S.W.3d at 525-26.

- 14 -

however, and did not even submit the results from their tuberculosis tests so they could begin intensive outpatient treatment. Mother and Father also failed to manifest a willingness to assume custody of the children by generally demonstrating a lack of interest in actually obtaining custody of the children. When the juvenile court suspended visitation due to Mother's and Father's failure to comply with any permanency plan requirements, the judge explained that visitation could be reinstated if the parents began complying with the plans. Despite the incentive of being able to visit their children, neither Mother nor Father completed any task on the permanency plans for the following seven months.

Regarding the second prong, we conclude that placing the children in the custody of Mother and Father "would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). "Substantial harm" requires "'a real hazard or danger that is not minor, trivial, or insignificant'" and, "'[w]hile the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.'" *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)). Both children have significant needs. The foster father testified that both children see a therapist twice a week, attend occupational therapy once a week, and attend physical therapy once every two weeks. Edmund takes anti-seizure medication and has seen a neurologist about an abnormality on the base of his skull. He was experiencing weakness on one side of his body, was diagnosed as blind in one eye, and had a milk allergy of which Mother and Father were unaware. Brian was diagnosed with anxiety, and both children were diagnosed with emotional and mental delays. Despite these health issues, both children have been thriving in foster care now that their needs are being met.

It is unlikely that Mother and Father could meet the children's significant needs. Mother and Father refuse to accept any responsibility for the children's health issues and blame any infirmity on the children's removal from their custody. Moreover, when the Department asked the parents for permission to put the children on medication to address some of their health issues, Mother and Father refused; the Department had to seek an order from the juvenile court. Neither parent did anything to improve his or her ability to care for these children. Mother and Father failed to complete any form of parenting course, parenting assessment, or psychological evaluation. Further, the parents' housing situation remained unstable.

For the aforementioned reasons, we conclude that the juvenile court did not err in finding that DCS proved this ground by clear and convincing evidence.

II. Best interest.

Having determined that clear and convincing evidence of at least one statutory ground exists to terminate Mother's and Father's parental rights, we must next consider

whether the trial court properly determined that termination of Mother's and Father's parental rights is in the best interest of the children. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. After a court finds that clear and convincing evidence exists to support a ground for termination, the child's interests diverge from those of the parent and the court focuses on the child's best interests. *In re Audrey S.*, 182 S.W.3d at 877. A court must view the child's best interest from the perspective of the child, not that of the parent. *Id.* at 878. A finding that at least one ground for termination of parental rights exists does not necessarily require that a parent's rights be terminated. *Id.* at 877. Because some parental misconduct is redeemable, our termination of parental rights statutes recognize that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* The facts a court considers in its best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555. Once a court makes the underlying factual findings, it should "consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

When considering whether terminating a parent's rights to a child is in the child's best interest, a trial court must consider the nine factors enumerated in Tenn. Code Ann. § 36-1-113(i). A trial court is not required to find that each of the enumerated factors exists before concluding that it is in the best interest of the child to terminate a parent's rights. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Although in some circumstances "the consideration of one factor may very well dictate the outcome of the analysis," *In re Audrey S.*, 182 S.W.3d at 878, a court is still obligated to consider "all the factors and all the proof." *In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017).

After considering all of the best interest factors, the juvenile court determined that termination of Mother's and Father's parental rights was in the best interest of the children. The juvenile court found that Mother and Father failed to make any adjustment to their circumstances so as to make it safe and in the children's best interest for the children to be in their home, nor did they effect any lasting adjustment of circumstances after reasonable efforts by the Department. *See* Tenn. Code Ann. § 36-1-113(i)(1), (2). Mother and Father testified that they had been living in a week-to-week motel since June 2019, but Ms. Terry was never able to contact them at this location. Both parents refused to accept responsibility for their actions that contributed to the children's significant health problems. Instead, they claimed that any health problems the children had been diagnosed with must have developed after they entered DCS custody. After Ms. Terry was assigned to the case, the Department assisted Mother and Father by providing, referring, or otherwise ensuring that they had access to the following services: (1) an alcohol and drug assessment and the recommended intensive outpatient treatment, (2) drug screens, (3) a parenting assessment, (4) a psychological evaluation, (5) a mental health assessment, and (6) bus passes. The Department assisted the parents by arranging for 3 visits with the children, two of which Mother and Father failed to attend. Despite the availability of these services, Mother and Father completed only one of the permanency plans' requirements.

- 16 -

The juvenile court also found that Mother and Father failed to maintain regular visitation with the children and did not have a meaningful relationship with them. *See* Tenn. Code Ann. § 36-1-113(i)(3), (4). After the initial visit in March 2018 was cut short, neither Mother nor Father had any other visits with the children. Although it is true that the juvenile court suspended visitation in December 2018, visitation could have been reinstated had the parents made efforts towards completing the permanency plans' requirements. Mother and Father still did not make any effort to comply with the plans, however, until one month before trial.

In addition, the juvenile court found that changing the children's caretakers and physical environment would have a negative effect on their well-being. *See* Tenn. Code Ann. § 36-1-113(i)(5). At the time of trial, the children had been in their current foster home for over a year. According to the court-appointed special advocate, Karen Goldsmith, the children craved routine and consistency. They have received both in the current foster home and have "become happier, more engaged" children. The children's hygiene, eating, and sleeping habits have significantly improved, and they have bonded with the foster family. The foster family has the resources to care for the children and wants to adopt them should they become available for adoption. Mother and Father, on the other hand, have repeatedly denied any responsibility for the children's health issues and refused to grant the Department permission to give the children necessary medication. Furthermore, when Mother approached the boys after a previous court proceeding, one of the children broke out into hives and the other child urinated upon seeing her.

The juvenile court found that Mother and Father "committed severe abuse against the children." *See* Tenn. Code Ann. § 36-1-113(i)(6). At the time of removal, Mother and Father had not potty-trained either child despite them being six and three years old, had never taken either child to the dentist, had not enrolled the oldest child in school, and only fed the children fast food. When the children finally received medical treatment, they were diagnosed with severe medical issues that included emotional and physical delays, seizures, severe anxiety, clinical rickets, vision problems, difficulty walking, and several cavities. Mother and Father denied any responsibility for these health issues and blamed DCS for any infirmity the children had. After the removal, Mother and Father failed to improve their parenting skills by completing any form of parenting assessment or parenting course.

Factor seven considers whether there is criminal activity in the home and whether a parent is often unable to care for a child due to substance abuse. Tenn. Code Ann. § 36-1-113(i)(7). During the nearly two years the children were in DCS custody, Mother and Father incurred several legal charges. Mother was arrested three times and spent eighteen days in jail for failing to appear in court hearings on various traffic violations. Father also spent time in jail due to his failure to appear in court for hearings related to charges for driving on a suspended license. Both Mother and Father had issues with sobriety. On February 1, 2019, Mother tested positive for THC and suboxone, and Father admitted on July 5, 2019, that he would test positive for THC if he was drug tested.

Factor eight focuses on a parent's mental or emotional status, and factor nine considers whether a parent has paid child support. *See* Tenn. Code Ann. § 36-1-113(i)(8), (9). The parties presented no evidence regarding these two factors.

In light of the foregoing, we conclude that the combined weight of the proven facts amounts to clear and convincing evidence that termination of Mother's and Father's parental rights is in the best interest of the children.

CONCLUSION

We affirm the juvenile court's termination of Mother's and Father's parental rights on all six statutory grounds and affirm the juvenile court's conclusion that termination of Mother's and Father's parental rights is in the best interest of the children. Costs of appeal are assessed equally against the appellants, Kimberly U. and Brian W., for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE